# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSE A. JUSINO,
    Plaintiff,

No. 3:18-cv-2004 (SRU)

v.

MONICA RINALDI, et al.,
    Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Jose Jusino ("Jusino") has been incarcerated in the Connecticut Department of Correction ("DOC") since 2005 and is presently serving a life sentence for the commission of a capital felony. Doc. 141-1 at ¶ 2; Doc. No. 140 at 1 ¶ 3. In the instant action, he brings four causes of action against sixteen current and former DOC employees: two claims alleging violations of his Eighth and Fourteenth Amendment rights based on conditions of confinement, one claim alleging violation of his Fourteenth Amendment right to due process, and one claim alleging retaliation in violation of the First Amendment. *See generally* Doc. No. 121-1.

The defendants have jointly filed a motion for summary judgment contending that Jusino did not sufficiently allege the personal involvement of the defendants; that he did not exhaust certain of his claims; that his claims fail as a matter of law; that certain of his claims are time barred; and that the defendants are entitled to qualified immunity. *See generally* Doc. No. 128-2.

At the hearing on the defendants' motion for summary judgment, I dismissed Jusino's conditions of confinement claims without prejudice to pursuit in other cases. Doc. No. 146; *see also* Doc. No. 147. Regarding the other claims, as I set forth in greater detail below, the defendants' motion for summary judgment, doc. no. 128, is **granted in part and denied in part**.

## I.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Id.* at 255; *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative, . . . summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## II.   Background

Jusino's amended complaint sets forth four causes of action, all pursuant to Section 1983. *See generally* Doc. No. 121-1. Jusino's complaint brings two conditions of confinement claims under the Eighth and Fourteenth Amendments, both of which I dismissed at the hearing on the motion for summary judgment. *Id.* at 16-18; *see* Doc. No. 146. Jusino also asserts a third claim alleging violation of his due process rights pursuant to the Fourteenth Amendment. Doc. No. 121-1 at 19-21. Additionally, Jusino brings a retaliation claim pursuant to the First Amendment. *Id.* at 21-22.

### A.   Procedural History

Jusino, acting initially as a *pro se*, filed this case on December 7, 2018, alleging that fifteen DOC defendants had violated his right to due process, right to equal protection, and right not to be subjected to cruel and unusual punishment. *See generally* Doc. No. 1. By initial review order on April 15, 2019, the Court partially dismissed Jusino's first complaint, permitted his due process claims regarding lack of meaningful periodic reviews of his Special Needs Status[1] and Security Risk Group Status to proceed, and granted Jusino leave to replead. *See* Doc. No. 8. Jusino subsequently filed an amended complaint. Doc. No. 27. By an additional initial review order, the Court dismissed certain of Jusino's claims, permitting his due process claims to proceed. *See* Doc. No. 28. *Pro bono* counsel was appointed for Jusino in April 2021. Doc. No.

---

[1] In their briefs, the parties interchangeably refer to "Special Needs Management" as "Special Needs," "Special Needs Status," and "Special Needs Management Status." Accordingly, I use the terms interchangeably throughout this Order.

91. Jusino filed two additional amended complaints in May and November, 2021, doc. no. 98 and doc no. 108, followed by the operative complaint on July 15, 2022. Doc. No. 121-1.

The defendants filed an answer to Jusino's most recent complaint on September 14, 2022, asserting eight affirmative defenses, including failure to state a claim, lack of personal involvement, and qualified immunity. Doc. No. 124. On December 12, 2022, the defendants filed the instant motion for summary judgment. *See* Doc. No. 128.

Jusino has also filed several other lawsuits against the DOC. As relevant to the case at bar, Jusino initiated a case in 2016 against Mark Frayne and other DOC defendants. *See generally Jusino v. Frayne et al.*, Dkt. No. 3:16-cv-00961-MPS. That case proceeded to trial, and a jury returned a verdict finding Mark Frayne liable for violating Jusino's rights under the Eighth Amendment. *See Jusino v. Frayne et al.*, Dkt. No. 3:16-cv-00961-MPS, Doc. No. 176.

### B. Incarceration Locations and Statuses

Jusino has been incarcerated since 2005, but he formally began serving his sentence on August 25, 2006. *See* Doc. No. 128-5 at 2. Since he began his term of incarceration, Jusino has been transferred numerous times between correctional institutions. *See* Doc. No. 128-5.

- Jusino was incarcerated at MacDougall-Walker Correctional Institution ("MacDougall-Walker") from May 26, 2006 until May 10, 2007. *Id*. at 1-2.

- Jusino was incarcerated at Northern Correctional Institution ("Northern") from May 10, 2007 until June 20, 2012. *Id*. at 1.

- Jusino served time at MacDougall-Walker from June 20, 2012 until March 7, 2013. *Id*.

- Jusino was then incarcerated at Northern from March 7, 2013 until November 8, 2013. *Id.*

4

- Jusino spent time at the University of Connecticut Hospital from November 8 until November 12, 2013. *Id.*

- Jusino then returned to Northern and was incarcerated there until July 31, 2018. *Id.*

- Jusino was transferred to MacDougall-Walker from July 31, 2018 until October 5, 2018. *Id.*

- Jusino was incarcerated at Corrigan Correctional Facility ("Corrigan") from October 5, 2018 until October 17, 2018. *Id.*

- Jusino then returned to MacDougall-Walker and served time there from October 17, 2018 until April 23, 2019. *Id.*

- Jusino was then incarcerated at Northern from April 23, 2019 until March 19, 2020. *Id.*

- Jusino served time at MacDougall-Walker from March 19, 2020 until February 20, 2022. *Id.*

- Jusino was placed in Medical Isolation at MacDougall-Walker from February 20, 2022 until September 12, 2022. *Id.*

- Finally, Jusino transferred to Cheshire Correctional Institution ("Cheshire") on September 12, 2022. *Id.*

Throughout his incarceration, Jusino has been classified under various restrictive housing statuses and has been housed in relatively restrictive conditions as a result. Doc. No. 141-1 at ¶ 5. He was classified as "Chronic Discipline Status" in 2007; at various points in time between 2007 and 2017, he was classified as "Administrative Segregation Status"; and at various points in time between 2010 and 2018, he was classified as "Special Needs Status." Doc. No. 141-1 at ¶ 5. *See*

*generally* Doc. No. 151-1. From 2009 through until 2020, Jusino was classified as a member of the "Security Risk Group." Doc. No. 141-1 at ¶ 5.; Doc. No. 151-2 at 2, 4-5.

### C.  Conditions of Confinement

For most of his time in prison, Jusino has been confined in relatively restrictive conditions of confinement. Jusino submits that his classification on Restrictive Housing Status beginning in 2007 has involved "prolonged indefinite and up to a lifetime of isolation," including "spend[ing] 22-24 hours per day in a concrete cell." Doc. No. 141-1 at ¶¶ 3, 6. As a result of his Restrictive Housing Status, Jusino avers that he has "spent years in various forms of isolation that approach the limits of human endurance," and the conditions of his confinement have "cause[d] serious and sometimes catastrophic deterioration" to his "mental health." *Id*. at ¶¶ 6, 16; *see also id*. at ¶ 17 (describing incidents of self harm).

From 2007 through 2014, and for various intervals of time between 2014 and 2020, Jusino was placed on restraint status, meaning he wore iron restraints around his legs when outside his cell, including when he showered. *Id*. at ¶ 7. In addition, at times, Jusino has been placed in-cell restraints and housed in a separate cell because he committed infractions. *Id*. at ¶ 12. Jusino declares that the cells in which he was placed during those periods were "small concrete observation cell[s], colloquially known as strip cell[s]." *Id*. The cells contained only a bed and a toilet. *Id*. They did not contain any "hygiene products" with which to wash one's hands, nor toilet paper. *Id.* He declares that at times he would request tissue paper from officers but would be refused, and consequently he was unable to clean himself after defecating. *Id.* He further submits that the cells were "contaminated with feces, blood, [and] urine." *Id.* Meals in those cells were served without utensils, so he would have to eat with his unwashed hands. *Id.* Jusino also submits that the in-cell restraints he wore when housed in those conditions consisted

of "shackling the legs and wrists, binding the hands to the feet with a short tether chain and fastening a belly chain around the waist." *Id*.

Jusino has also been placed on observation status for intervals of time during his incarceration at Northern. *Id*. at ¶ 13. Under observation status, Jusino was housed either in the medical infirmary or in the strip cell. *Id*. Jusino submits that he had to wear only a small safety gown and safety blanket that did not cover his entire body. *Id*. He was denied his ordinary access to his property and privileges, as well as access to toilet paper. *Id*. In addition, a light from above would keep his cell illuminated twenty-four hours a day. *Id*. Jusino submits that he went "weeks at times" in observation status. *Id*.

Since 2007, Jusino has had to eat all meals inside his cell. *Id.* at ¶ 8. Since 2007, Jusino has had to spend his limited recreation time in cages "surrounded by cement [or] brick walls" open to the outside only from above. *Id*. at ¶ 9; *see also* Doc. No. 141-2 at ¶¶ 3-4; Doc. No. 141-3 at ¶ 3. Jusino submits that the cages are "filthy" with spit from other prisoners, bird feces, and spider webs. Doc. No. 141-1 at ¶ 9; *see also* Doc. No. 141-2 at ¶ 4; Doc. No. 141-3 at ¶ 4. Additionally, Jusino has had no access to social visits since 2007, and at various temporal intervals between 2007 and 2020, he has been prohibited from having non-immediate family visits. Doc. No. 141-1 at ¶ 10. Furthermore, since 2007, Jusino has not had access to religious services or education services. *Id*. at ¶ 14.

After Jusino's 2018 transfer from Special Needs Status to Security Risk Group Status, Jusino states that he lost privileges he had accumulated while on Special Needs Status. He submits that his outdoor recreation, gym recreation, programming, job assignment, family visits, commissary spending, and access to personal property were restricted after the transfer. *Id.* at ¶ 33. After a subsequent disciplinary incident, his privileges were further restricted, such that he

only had one hour of outside recreation five days a week, had three fifteen-minute showers per week, and had to wear restraints coming out of his cell and while "inside a secured cage." *Id.*

### D. Disciplinary Issues

Officials within the DOC consider Jusino to be "one of the more dangerous inmates in the state." Doc. No. 128-11 at 78. Jusino "has received at least 103 disciplinary tickets" during his term. Doc. No. 140 at 2 ¶ 6. Nevertheless, Jusino contends that at times he has "gone months or years without even [a] minor disciplinary violation," yet the DOC continuously considers him "'dangerous' regardless of his actual behavior." Doc. No. 141-1 at ¶ 15; *see also* Doc. No. 149 at ¶ 14.

In 2009, Jusino killed his cellmate. *See* Doc. No. 140 at 1-2 ¶ 4. According to DOC officials, Jusino carved his Latin King gang name into his cellmate's chest.[2] *Id.* Furthermore, "[o]n March 7, 2013, while housed as a Special Needs inmate at Walker [Correctional Institution]," Jusino "set fire to his cell and then interfered with correctional staff who were attempting to put out the fire." *Id.* at 2 ¶ 7. In addition, "[o]n December 13, 2016, during a shakedown of [Jusino's] cell at Northern [Correctional Institution], correctional officers found two pieces of 7 inch metal objects which had been altered into dangerous instruments." *Id.* at 2 ¶ 9. Jusino "admitted to possession of the metal objects and stated that they were intended for use on Dr. Frayne," the prison psychiatrist. *Id.* at 2 ¶ 10. Specifically, Jusino "told Dr. Frayne that 'the shanks were for him.'" *Id.*

### E. The Defendants

Jusino brings his claims against sixteen current and former employees of the DOC:

---

[2] Jusino contests the DOC's characterization of the killing and of Jusino's gang membership. Doc. No. 140 at 1-2 ¶ 4; Doc. No. 141-1 at ¶ 29.

1. Craig Burns ("Burns"), Medical Director from January 2015 through December 2017, doc. no. 151-1 at 2; "Psych Services" Medical Director from December 2017 through May 2018, *id.*; Chief Mental Health Officer from May 2018 through January 2020, *id.*; and "a member of the Northern Correctional Institute's reviewing team." Doc. No. 140 at 10 ¶ 10.

2. Mark A. Frayne ("Frayne"), "supervising psychologist at Northern Correctional Institute" from June 2018 through September 2018. Doc. No. 140 at 10 ¶ 11; Doc. No. 151-1 at 2.

3. Thomas Kocienda ("Kocienda"), "director of psychological services and a member of Northern Correctional Institute's reviewing team" and health management administrator from January 2015 through January 2020. Doc. No. 140 at 11 ¶ 12; Doc. No. 151-1 at 2.

4. William Mulligan ("Mulligan"), Deputy Warden of Northern from January 2015 through August 2016, Warden of Northern from August 2016 through April 2019, and District Administrator from April 2019 through January 2020. Doc. No. 151-1 at 2.

5. Nick Rodriguez ("Rodriguez"), Warden of Northern from October 2017 through April 2019. Doc. No. 151-1 at 2.

6. Derrick Molden ("Molden"), Deputy Warden at Northern from September 2016 through April 2019. Doc. No. 151-1 at 2.

7. Antonio Santiago ("Santiago"), "the director of security for the DOC" from March 2018 through January 2020. Doc. No. 140 at 12 ¶ 16; Doc. No. 151-1 at 2.

8.  Elizabeth Tugie ("Tugie"), a member of "population management for the DOC." Doc. No. 140 at 12 ¶ 17; *see also* Doc. No. 151-1 at 2.

9.  David Maiga ("Maiga"), "director of offender classification for the DOC" at Northern in 2018. Doc. No. 140 at 13 ¶ 18; Doc. No. 149 at ¶ 12.

10. John Aldi ("Aldi"), "the intelligence coordinator for the DOC," who retired in April 2019. Doc. No. 140 at 13 ¶ 19; Doc. No. 151-1 at 2.

11. Scott Semple ("Semple"), "the former commissioner of the DOC," who served from January 2015 through January 2019. Doc. No. 140 at 13 ¶ 20; Doc. No. 151-1 at 2.

12. Rollin Cook ("Cook"), "the commissioner of the DOC" who served from January 2019 through January 2020. Doc. No. 140 at 13 ¶ 21; Doc. No. 151-1 at 2.

13. Daniel Papoosha ("Papoosha"), "the Gang Intelligence Coordinator for the DOC." Doc. No. 140 at 13 ¶ 22; Doc. No. 149 at ¶ 16. According to the defendants' records, Papoosha began working in the DOC Security Division in January 2019. Doc. No. 151-1 at 2; Doc. No. 128-14 at 1 ¶ 2; Doc. No. 128-15 at ¶ 1.

14. Monica Rinaldi ("Rinaldi"), "the Deputy Commissioner of the DOC," who retired in January 2019. Doc. No. 140 at 14 ¶ 23; Doc. No. 151-1 at 2.

15. Edward Maldonado ("Maldonado"), "the Warden at Northern Correctional Institute" and, later, DOC District Administrator from April 2017 until his retirement in January 2019. Doc. No. 140 at 14 ¶ 24; Doc. No. 149 at ¶ 18; Doc. No. 151-1 at 2.

16. Angel Quiros ("Quiros"), "the Warden at Northern Correctional Institute" as of 2010; District Administrator from January 2015 through January 2019; and

Deputy Commissioner from January 2019 through January 2020. Doc. No. 140 at 14 ¶ 25; Doc. No. 149 at ¶ 19; Doc. No. 151-1 at 2.

## III.   Discussion

At the hearing on the defendants' motion for summary judgment, I held on the record that Jusino's conditions of confinement claims are dismissed without prejudice to pursuit in other cases. *See* Doc. No. 146; *see also* Doc. No. 147. I explained on the record that Jusino has several other cases pending within this District that raise conditions of confinement claims that overlap with the claims raised in the instant action. In the case before me, however, the record has not been developed in a way that permits me to meaningfully evaluate the conditions of confinement claim.

There are five remaining grounds on which the defendants seek summary judgment: insufficient allegations of personal involvement of the defendants; exhaustion under the Prison Litigation Reform Act; that Jusino's due process claim and retaliation claim fail as a matter of law; that Jusino's claims are barred by the statute of limitations; and qualified immunity. *See generally* Doc. No. 128-2. For the reasons articulated below, the defendants' motion is granted in part and denied in part.

### A.   Sufficiency of the Amended Complaint's Allegations of the Defendants' Personal Involvement

The defendants move for summary judgment on the ground that Jusino's amended complaint does not sufficiently allege each defendant's personal involvement. Doc. No. 128-2 at 13. The defendants assert that "[t]he plaintiff's Amended Complaint is virtually bereft of any factual allegations concerning the sixteen individual defendants, let alone any factual allegations establishing their *direct participation* in an Eighth Amendment violation." *Id*. at 14.

11

By basing their argument on the insufficiency of Jusino's pleadings, the defendants appear to call on this Court to dismiss Jusino's amended complaint for failure to state a claim. Where a party's motion for summary judgment on an issue "is directed at the legal sufficiency" of the opposing party's claim, "and not at the factual basis for the claim," courts have held that "it is appropriate to assess the motion under a Rule 12(b)(6) standard." *See Leary v. Manstan*, 2015 WL 521497, at *5 (D. Conn. Feb. 9, 2015). If a court intends to "base[] its decision to dismiss solely on the pleadings," it "may convert a motion for summary judgment into a Fed. R. Civ. P. 12(b)(6) motion to dismiss a complaint for failure to state a claim without notice to either party." *Scafe v. Pataki*, 2009 WL 2707317, at *6 (E.D.N.Y. Aug. 26, 2009) (citing *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989)); *see also Risco v. McHugh*, 868 F. Supp. 2d 75, 106 n.45 (S.D.N.Y. 2012) ("The Second Circuit has recognized that, '[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.'") (quoting *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968)); *Gray v. Metro. Det. Ctr.*, 2011 WL 2847430, at *5 (E.D.N.Y. July 15, 2011) ("To the extent that a defendant's motion for summary judgment under Rule 56 is based entirely on the plaintiff's complaint, a court may treat the motion as a motion to dismiss for failure to state a claim under Rule 12(b)(6)."). Accordingly, because the defendants base their argument regarding personal involvement solely on the content of Jusino's pleadings, and not on the facts in the record, I will treat that portion of their motion as a motion for failure to state a claim pursuant to Rule 12(b)(6).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When

considering claims under that standard, courts are to "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)," but a plaintiff's "[f]actual allegations must" nevertheless "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). In *Tangreti*, the Second Circuit held that "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citing. *Iqbal*, 556 U.S. at 676); *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Still, "at the pleadings stage, courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent." *Stone v. Annucci*, 2021 U.S. Dist. LEXIS 186195, at *35 (S.D.N.Y. Sept. 28, 2021). Thus, although "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," a plaintiff is still "required to include allegations of the facts or events they claim give rise to an inference of knowledge." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (citation omitted).

As previously mentioned, I dismissed Jusino's first and second causes of action on the record at the hearing on the motion for summary judgment. Doc. No. 146. Jusino's third and fourth causes of action are the claims that remain, and for those claims Jusino states particularized allegations against several of the defendants. Jusino's third cause of action, alleging that the defendants "conspir[ed] to deprive him of a meaningful review process regarding his six-month review pertaining to his Security Risk Group and Special Needs

Management classification statuses," contains particularized allegations against Aldi, Burns, Frayne, Kocienda, Molden, Maldonado, Maiga, Mulligan, Papoosha, Quiros, Rinaldi, Rodriguez, Santiago, Semple, and Tugie. Doc. No. 121-1 at 19. "[D]raw[ing] all reasonable inferences in favor of the plaintiff[]," those allegations of personal involvement are sufficient to withstand a Rule 12(b)(6) motion. *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 121 (D. Conn. 2020) (citing *Iqbal*, 556 U.S. at 678-79). Jusino's fourth cause of action, alleging that certain of the defendants retaliated or conspired to retaliate against Jusino, also brings sufficiently particularized allegations regarding the defendants' personal involvement. Specifically, Jusino's fourth cause of action sets forth allegations against Rinaldi, Santiago, Kocienda, Rodriguez, Molden, Maiga, Tugie, Semple, Aldi, and Papoosha. Doc. No. 121-1 at 21-22.

Accordingly, applying the Rule 12(b)(6) standard and drawing all reasonable inferences in Jusino's favor, Jusino's third cause of action may proceed against Aldi, Burns, Frayne, Kocienda, Molden, Maldonado, Maiga, Mulligan, Papoosha, Quiros, Rinaldi, Rodriguez, Santiago, Semple, and Tugie. Furthermore, Jusino's fourth cause of action may proceed against defendants Rinaldi, Santiago, Kocienda, Rodriguez, Molden, Maiga, Tugie, Semple, Aldi, and Papoosha. Even though Jusino's third and fourth claims against sixteen defendants survive the plausibility standard of 12(b)(6), Jusino is nevertheless advised to carefully consider the prudence of attempting to prove the personal involvement of sixteen defendants at trial.

B. Retaliation Claim

The defendants advance three arguments in support of their motion for summary judgment on Jusino's retaliation claim: that Jusino did not properly exhaust those claims, that those claims are time barred, and that they fail as a matter of law. I discuss each contention in turn.

1.  *Exhaustion of Retaliation Claim under the Prison Litigation Reform Act*

The defendants move for summary judgment on Jusino's retaliation claims on the ground that he did not properly exhaust them. *See* Doc. No. 128-2 at 5, 9; *see also* Doc. No. 156 at 6. Under the Prison Litigation Reform Act ("PLRA"), an incarcerated individual is required to exhaust his administrative remedies before filing a federal lawsuit related to prison conditions. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The statutory exhaustion requirement applies to all claims concerning "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002). Exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (citation omitted).

The PLRA's exhaustion requirement may be excused, however, if an administrative remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 642-43 (2016). The Supreme Court has set forth three circumstances in which an administrative procedure is effectively unavailable. Those circumstances are: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 643-44.

The Second Circuit analyzes exhaustion pursuant to the PLRA under the principles of notice pleading. In *Johnson v. Testman*, the Second Circuit approvingly cited the Seventh Circuit's holding that "if prison regulations do not prescribe any particular content for inmate

15

grievances, 'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.'" 380 F.3d 691, 697 (2d Cir. 2004) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

Administrative Directive 9.6 sets forth the administrative remedy process of the DOC. Within that directive, the Inmate Grievance Procedure sets forth the DOC's "administrative remedy for any issue relating to policy and procedure, and compliance with established provisions." Doc. No. 128-3 at 5. An incarcerated individual is first required "to seek informal resolution" before filing a grievance. *Id.* "If the verbal option does not resolve the issue, the inmate shall submit a written request" using the Inmate Request Form. *Id.* The individual "must clearly state the problem and the action requested to remedy the issue." *Id.* If the individual is "not satisfied with the informal resolution offered," he may file a grievance "within 30 calendar days of the occurrence or discovery of the cause of the grievance." *Id.* at 6. If the individual's grievance is denied or rejected, he may appeal that grievance to the next level—either a Level 1 Review or a Level 2 Review. *Id.* at 7. Generally, dispositions of Level 2 Reviews are the "final level of appeal for all grievances." *Id.* Certain grievances are eligible for a Level 3 Review, however, but only if those grievances "challenge[] Department level policy; challenge[] the integrity of the grievance procedure; or [e]xceed[] the established 30 business day time limit for a Level 2 grievance response." *Id.* (cleaned up). Level 3 Reviews "shall be made by the Commissioner or designee." *Id.*; *see generally Correa v. McLeod*, 2018 U.S. Dist. LEXIS 242249, at *9 (D. Conn. June 4, 2018) (describing the grievance procedures of Administrative Directive 9.6).

Jusino's retaliation claim has two components. *See generally* Doc. No. 121-1 at 22. One component is his allegation that the defendants retaliated against him "by facilitating his reclassification to a more restrictive status in 2018" due to his "refusal to settle the previously-filed lawsuit, *Jusino v. Frayne*." *Id.* at ¶ 62. The other portion is Jusino's allegation that, in retaliation against Jusino because of a favorable initial review order by this Court, Papoosha "fabricat[ed] a disciplinary report" against Jusino, and Papoosha, Maiga, and Santiago used that report to transfer Jusino to Northern. *Id.* at ¶¶ 63-64.

Turning to the first component of Jusino's retaliation claim, on May 5, 2018, Jusino filed a Level 1 grievance, # 141-18-266, complaining that he was told that he could not transfer from Northern or from Special Needs Status unless he settled a pending lawsuit. *See* Doc. No. 128-7 at 2. That grievance was denied on July 10, 2018. *Id.* The DOC has no record of Jusino filing an appeal. *See* Doc. No. 128-6 at ¶ 11. Jusino, however, argues that he "undertook every reasonable effort to pursue a Level 2 appeal of the 2018 grievance," but "his efforts were . . . frustrated by the DOC's failure to process that appeal." Doc. No. 141 at 4. Jusino submits by declaration that he "timely deposited the appeal paperwork in the DOC-designated 'grievance mailbox,'" but it was not processed. Doc. No. 141-6 at ¶ 7. Jusino describes that mailbox as the "secured DOC-designated mailbox, labeled 'Administrative Remedies,' located at Northern Correctional Institute ('NCI') in the 1 West Housing Unit area of that facility." Doc. No. 149 at ¶ 2.

As a general matter, "[c]ourts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." *Rodriguez v. Cross*, 2017 U.S. Dist. LEXIS 71337, at *19 (N.D.N.Y. May 9, 2017) (collecting cases). For example, in *Rodriguez v. Cross*, the Northern District of New York held that the "bare assertion[]" that defendants are

"strategically removing grievances from the mailbox" to cover up a constitutional violation was insufficient to "excuse exhaustion requirements." *Id*.  Additionally, in *Correa v. McLeod*, another judge within this district held that a "plaintiff's contention that he timely filed his grievance and had 'no control' over when correctional staff received it is unsupported by any evidence other than his own affidavit, which is insufficient to defeat summary judgment." 2018 U.S. Dist. LEXIS 242249, at *17 (collecting cases).

Jusino, however, has more than just his testimony to support his assertion that he appealed that grievance. In particular, Jusino submitted a separate grievance on August 29, 2018, complaining that the "unit mailbox is a cardboard box with no . . . lock, giving access to anybody to grab the mail and do what they please with it." Doc. No. 128-9 at 8 (cleaned up). Jusino then requested "a secure mailbox." *Id*. That grievance was "compromised" on October 24, 2018, and the response stated that "[i]nmates that are housed in B1 housing unit now have access to a mailbox inside the unit for all outgoing mail." *Id*. Jusino submitted that grievance regarding mailbox security a little over a month after his 2018 Level 1 retaliation grievance, # 141-18-266, had been denied. *See* Doc. No. 128-7 at 2. Thus, Jusino's grievance concerning mailbox security coincides with the time period in which Jusino would have submitted his Level 2 appeal of the 2018 retaliation grievance had he properly appealed it. The existence of that mailbox-security grievance, coupled with Jusino's testimony regarding his attempt to file an appeal by depositing his appeal in an unsecured mailbox, therefore creates a genuine issue of material fact regarding whether Jusino indeed attempted to appeal his 2018 retaliation grievance. *See Lanko v. Wetzel*, 2023 WL 2307101, at *6-*7 (W.D. Pa. Mar. 1, 2023).

Furthermore, some facts of record also suggest that there were periods of time during which Jusino was unable to file grievances. For example, a letter from Mulligan to Jusino dated

September 24, 2018, shows that during the period of September 24, 2018 through March 20, 2019, Jusino was prohibited from filing grievances because the DOC determined him to have abused the administrative remedy process. Doc. No. 149 at 14. Additionally, Jusino avers in his declaration that while incarcerated at Corrigan, he "was unable to file grievances because [he] had been confined to segregated status the entire time [he] was there." Doc. No. 141-6 at ¶ 12. Jusino was incarcerated at Corrigan from October 5, 2018 through October 17, 2018, and the defendants do not deny that Jusino did not file any administrative grievances during that period. Doc. No. 128-5 at 1; Doc. No. 128-2 at 12. At trial, Jusino can reasonably testify to his segregated status or other conditions of his confinement at Corrigan that could have rendered his administered remedies unavailable to him. Moreover, the defendants do not supply their own facts supporting the availability of administrative remedies to Jusino during his 2018 confinement at Corrigan. *See* Doc. No. 128-10. Because Jusino provides testimony with a supporting argument for why his remedies were unavailable to him when he was confined at Corrigan, I conclude that there is a genuine issue of material fact regarding whether Jusino's administrative remedies were available to him from October 5, 2018 through October 17, 2018. Doc. No. 128-5 at 1; *see Cestaro v. Prohaska*, 2023 WL 4425737, at *2 (S.D.N.Y. July 7, 2023) ("In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."); *Conley v. Wetzel*, 2023 WL 2649090, at *7 (W.D. Pa. Mar. 27, 2023). *Cf. BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ("It is not sufficient [for a party opposing a motion for summary judgment] merely to assert a conclusion without supplying supporting arguments or facts").

Turning to the second component of Jusino's retaliation claim, Jusino submits by affidavit that he "first provided the Disciplinary Hearing Officer with a written statement that ultimately disappeared from [his] file." Doc. No. 149 at ¶ 2. He further submits that "[w]hen [he] was transferred to [Northern], [he] submitted the Level 1 grievance in the 2 West Housing Unit 'Administrative Remedies' secured mailbox." *Id.*; *see also* Doc. No. 141-6 at ¶ 8 (Jusino declaration stating that he attempted to file a grievance in April 2019 by depositing the grievance "in the DOC-designated 'grievance mailbox,'" but that grievance was never processed.). Jusino further avers that in May 2019, he spoke to "the Warden or Deputy Warden, a white female, whom [he] believe[s] has a surname beginning with the letter, 'M,'" about his grievance, and she told him "she would forward [his] grievance to the Director of Security," Papoosha's supervisor. *Id*. The defendants are correct in arguing that an informal effort to put a prison official on notice of a grievance would be insufficient for exhaustion purposes. *See* Doc. No. 156 at 12 (citing *McLaurin v. Otero*, 2022 U.S. Dist. LEXIS 135887, at *17 (D. Conn. Aug. 1, 2022)). That such a conversation between Jusino and "M" possibly occurred supports the inference, however, that Jusino indeed attempted to exhaust his claim. Moreover, to the extent that "M" may be identified, she could supply testimony at trial that could support Jusino's accounting of events.[3] I therefore conclude that Jusino has supplied enough information to create a genuine issue of material fact regarding whether Jusino in fact attempted to exhaust the second portion of his retaliation claim. *See Lanko*, 2023 WL 2307101, at *6-*7.

---

[3] The record shows that Jusino also filed a grievance, # 137-21-184, on March 29, 2021 complaining that Papoosha had fabricated a disciplinary report in retaliation for one of Jusino's lawsuits. Doc. No. 141-7 at 3. That grievance was denied on April 29, 2021, Jusino appealed it on May 1, 2021, and the appeal was denied on May 25, 2021. *Id.*; Doc. No. 141-8 at 2. Administrative Directive 9.6, however, requires Jusino to file a grievance "within 30 calendar days of the occurrence or discovery of the cause of the grievance." Doc. No. 128-3 at 6. Jusino knew that he was transferred to Northern on April 23, 2019—the day he was transferred. *See* Doc. No. 128-5. Therefore, to the extent that Jusino intended to grieve that transfer as retaliatory, his grievance would have been due within 30 calendar days of April 23, 2019, or May 23, 2019. Jusino's 2021 grievances are therefore untimely and will not be considered for this claim.

Accordingly, there are genuine issues of material fact that preclude me from determining whether Jusino properly exhausted his retaliation claim regarding his 2018 reclassification and his retaliation claim regarding the fabricated disciplinary report and the 2019 transfer.

     2.   *Statute of Limitations for Retaliation Claim*

The defendants further argue that Jusino's retaliation claim is barred by the statute of limitations. In their briefing, the defendants aver that Jusino raised the retaliation claim for the first time in his most recent amended complaint, filed July 15, 2022. Doc. No. 121-1. Contrary to that assertion, however, Jusino's retaliation claim also appeared in two of his prior amended complaints, with the earliest filed on May 20, 2021. Doc. No. 98 at 16; *see also* Doc. No. 108 at 17.

"Congress did not enact a statute of limitations" for Section 1983 actions, so federal courts are to "borrow a state statute of limitations." *Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994). In Connecticut, the statute of limitations for a Section 1983 action is "three years from the date of the act or omission complained of." *Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005) (quoting Conn. Gen. Stat. § 52-577). Furthermore, Federal Rule of Civil Procedure 15(c) provides that an "amendment to a pleading" can "relate[] back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P. 15(c)(B). A claim in an amended complaint can thus relate back to the date of an earlier complaint, provided that the defendants had "adequate notice of the matters raised in the amended pleading." *Flagstar Bank, FSB v. Ticor Title Ins. Co.*, 660 F. Supp. 2d 346, 353 (D. Conn. 2009) (citation omitted); *see also* Fed. R. Civ. P. 15(c).

Here, Jusino first raised his retaliation claim in May 20, 2021. Doc. No. 98 at 16. His most recent amended complaint alleges that the defendants retaliated against him on July 31, 2018 when they transferred him to the SRG program at Walker, doc. no. 121 at ¶ 46; and that Papoosha retaliated against him by "fabricating a disciplinary report against" Jusino after the Court's April 16, 2019 initial review order. *Id*. at ¶ 63. Accordingly, for Jusino's July 31, 2018 retaliation claim to be timely, he would have had to raise that claim by July 31, 2021. For Jusino's April 2019 retaliation claim to be timely, he would have had to raise that claim by April 16, 2022 at the latest. Because Jusino raised his retaliation claim in his May 20, 2021 amended complaint, his retaliation claims are timely. *See* Doc. No. 98 at 16.

3. *Defendants' Argument that Retaliation Claim Fails as a Matter of Law*

In a footnote to their briefing on their motion for summary judgment, the defendants argue that Jusino's retaliation claim fails as a matter of law because he cannot show the existence of an "adverse action." *See* Doc. No. 128-2 at 10 n.3. Courts in this circuit have held that "arguments [that] appear only in footnotes . . . are not properly raised, and the Court is under no obligation to consider them." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y.) (collecting cases), *aff'd*, 626 F. App'x 20 (2d Cir. 2015); *see Wang v. Bethlehem Cent. Sch. Dist.*, 2022 WL 3154142, at *12 nn.8-9 (N.D.N.Y. Aug. 8, 2022); *see also United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). Accordingly, I decline to consider the defendants' argument that Jusino's retaliation claim fails as a matter of law.

C.  Due Process Claim

The defendants also move for summary judgment on the basis that Jusino's due process claim fails as a matter of law, as well as that portions of that claim are untimely. *See* Doc. No. 128-2 at 3-4, 19.

The Due Process Clause of the Fourteenth Amendment protects individuals against deprivations of life, liberty, or property. U.S. Const. amend. XIV. A state therefore cannot deprive a citizen of "life, liberty, and property[] . . . except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). To prevail on his due process claim at trial, Jusino would need to prove two elements: first, that "there exists a liberty or property interest of which [he] has been deprived, and if so," second, that "the procedures followed by the State" were constitutionally insufficient. *Green v. Caron*, 2021 WL 2723112, at *2 (D. Conn. July 1, 2021) (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam)).

1.  *Liberty Interest*

Turning to the first element, the Supreme Court has held that although "prisoners do not shed all constitutional rights at the prison gate," not "every state action carrying adverse consequences for prison inmates automatically activates a due process right." *Sandin v. Conner*, 515 U.S. 472, 485 (1995); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). An incarcerated person does not generally have a liberty interest in a particular discretionarily assigned classification. *See Torres v. Howell*, 2006 WL 1525942, at *15 (D. Conn. May 30, 2006) (collecting cases); *see also Meachum v. Fano*, 427 U.S. 215, 225 (1976).

Nevertheless, a prisoner's classification could indirectly implicate a liberty interest to the extent that the classification leads to the imposition of an atypical and significant hardship. In

*Sandin*, the Supreme Court clarified the "liberty interest" prong of due process analysis, writing that

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, 515 U.S. at 483-84 (internal citations omitted); *see also Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'"); *Palmer v. Richard*s, 364 F.3d 60, 64 (2d Cir. 2004) ("A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' . . . Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'") (internal citations omitted). In *Wilkinson*, the Supreme Court held that prisoners had a "liberty interest in avoiding assignment" to a particular maximum-security facility because that assignment would "impose an atypical and significant hardship." 545 U.S. at 224.

Thus, Jusino does not have a protected liberty interest in any of his classification statuses. He may, however, have a protected liberty interest in being free from certain conditions of confinement associated with those statuses—provided those conditions "impos[e] atypical and significant hardship" on him "in relation to the ordinary incidents of prison life." *Id*. Generally,

an "atypical and significant hardship" depends on the totality of the circumstances. *Sealy v. Giltner*, 197 F.3d 578, 586-88 (2d Cir. 1999). Courts determining whether a hardship is atypical and significant have compared the frequency and duration of similar conditions of confinement. *See, e.g.*, *Colon v. Howard*, 215 F.3d 227, 230-32 (2d Cir. 2000); *see also Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000). Regarding "atypicality," courts have drawn comparisons against the conditions afforded to the general population within a prison system, as well as against the conditions for those in routine administrative confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999).

In the solitary confinement context, the Second Circuit has held that a prisoner's incarceration in solitary conditions can sometimes satisfy the liberty interest prong of a due process claim, particularly if that incarceration was for a sufficiently lengthy duration. In *Colon v. Howard*, the Second Circuit considered the 23-hour-per-day solitary confinement of a prisoner and determined that although there are no "precise calipers to measure [the] severity of [solitary confinement] hardship . . . wherever the durational line is ultimately drawn, 305 days satisfies the standard." 215 F.3d at 231-32. Although the Second Circuit explicitly rejected a bright-line rule, it maintained that claims involving solitary confinement between 101 and 305 days can also meet the atypicality and significance standards, but the "development of a detailed record" is encouraged for those claims. *Id.* That factual record may include, for example, evidence of psychological effects sustained by the prisoner. *Id.* The Second Circuit further explained that although "[t]he longest confinement in normal SHU conditions that we have ruled was not shown to meet the *Sandin* standard was 101 days," a confinement period "of less than 101 days could be shown on a record more fully developed . . . to constitute an atypical and severe hardship." *Id.* at 231, 232 n.5; *see also Sims*, 230 F.3d at 23 ("Although we have not established

a bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant, we have characterized segregative sentences of 125-288 days as 'relatively long,' and thus necessitating 'specific articulation of . . . factual findings' before the district court could properly term the confinement atypical or insignificant.") (internal citations omitted).

Reading the record facts in the light most favorable to Jusino, I conclude that Jusino was confined in solitary confinement conditions for at least 305 days while on Special Needs Management Status and while in the Security Risk Group. *See* Doc. No. 140 at 15 ¶ 31 (stating that Jusino was in isolation from 2007 through 2013 and 2016 through 2020); *see also* Doc. No. 149 at ¶ 26 (Jusino affidavit stating he was placed "in solitary confinement on an indefinite basis"); Doc. No. 144-5 at 23 (grievance in which Jusino states that he was confined in solitary confinement, and reviewing official denies those conditions); Doc. No. 141-1 at ¶ 6 (Jusino submission that he "spent years in various forms of isolation that approach the limits of human endurance"); Doc. No. 128-11 at 16-17 (Papoosha deposition stating that restrictive statuses, including special needs, "could include confinement to a cell for the majority of the day" or "23 hours of the day"). *Cf. Reynolds v. Quiros*, 990 F.3d 286, 294 (2d Cir. 2021) (factual dispute regarding whether incarcerated individual's prolonged isolation constituted solitary confinement precluded summary judgment). There are, however, issues of fact regarding when Jusino was confined in solitary confinement conditions and for what duration he was confined in those conditions. *See* Doc. No. 140 at 2 ¶ 8 (disputed fact regarding Jusino's movements and confinements in various locations); Doc. No. 157 at 4 (describing inconsistencies in the record regarding Jusino's classification statuses); *see also* Doc. No. 128-2 at 12 n.4; Doc. No. 141-1 at ¶ 26 (Jusino's statement that by 2018, he had "accumulated privileges" while on Special Needs Management Status "that resemble general population").

26

Additionally, even apart from Jusino's isolation, a jury could determine that other aspects of Jusino's conditions of confinement beginning at the commencement of his incarceration were sufficiently "significant" such that they trigger a liberty interest. *See, e.g.*, Doc. No. 141 at 13-14; Doc. No. 141-1 at ¶¶ 9-14, 33.

Furthermore, there is a genuine issue of material fact regarding the atypicality of Jusino's confinement conditions. When I read the record facts in the light most favorable to Jusino, the records do not conclusively show that Jusino's conditions of confinement "mirrored" those of other carceral statuses or of conditions in general population. *See* Doc. No. 128-11 at 78 (Papoosha deposition stating that Jusino "is part of a very small population [of inmates] within the state and he is considered . . . to be one of the more dangerous inmates in the state," so prison officials have managed him accordingly); *see also* Doc. No. 141-2 (declaration of another individual housed in the Security Risk Group Unit describing the conditions in a manner consistent with Jusino's description); Doc. No. 141-3 (same). *Cf. Sandin*, 515 U.S. at 486 (comparing the confinement of the prisoner to other prisoners "inside and outside disciplinary segregation," considering the fact that inmates in general population at that prison also endured "significant amounts of 'lockdown time,'" and concluding from those facts that the confinement was not atypical and significant).

Accordingly, viewing the record in the light most favorable to the nonmoving party, I conclude that the defendants cannot establish, as a matter of law, that Jusino did not have a liberty interest sufficient to fulfill the first prong of a due process claim.

### 2. *Adequacy of Procedures*

The defendants also move for summary judgment on the basis that Jusino "received all of the process he was due" regarding his Special Needs Classification, review of his Special Needs

Classification, his Security Risk Group classification, and review of his Security Risk Group classification. Doc. No. 128-2 at 19.

"It is well established that whenever process is constitutionally due, no matter the context, '[i]t ... must be granted at a meaningful time and in a meaningful manner.'" *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (collecting cases).

### a.   Jusino's Initial Classification as Special Needs Management Status

Jusino commenced Special Needs Status in 2017. *See* Doc. No. 151-2 at 2, 5. Prior to that classification, on December 13, 2016, Jusino received two disciplinary reports because officers had discovered two pieces of metal in his cell fashioned into weapons, and Jusino had admitted that the weapons were to be used against Dr. Frayne. Doc. No. 131 at 9; *see also id.* at 15-16; Doc. No. 140 at 2 ¶¶ 9-10. Jusino was subsequently placed on administrative segregation on January 13, 2017. *See* Doc. No. 131 at 38; *see also* Doc. No. 151-2 at 5. On April 25, 2017, Northern's Administrative Segregation Phase Program conducted a "Facility Classification Committee Review" to determine whether Jusino should be moved to Special Needs Management. Doc. No. 131 at 38. Several officials signed off on the recommendation to place Jusino in Special Needs Management, including Warden Faneuff. *See id.*; *see also* Doc. No. 151-2 at 5 (stating that Special Needs status was approved on April 25, 2017). Also on April 25, 2017, Faneuff wrote to Semple, Kocienda, and Miaga requesting to move Jusino from administrative segregation into Special Needs Management Status. *See* Doc. No. 131 at 30. The letter contained a summary of Jusino's disciplinary history, including Jusino's most recent infraction from December 2016, which was the basis for his placement on administrative segregation. *See id.* Records show that on April 28, 2017, Dr. Frayne prepared a Special Needs Status Individualized Facility Management Plan for Jusino, signed by Kocienda on May 3, 2017.

*Id.* at 32-33. A hearing to determine whether to place Jusino on Special Needs Management Status was scheduled for May 7, 2017. On April 27, 2017, Jusino submitted an inmate request form asking for the Special Needs hearing officer to be informed that Jusino "waive[s] [his] hearing" and has "nothing to say." *Id.* at 35. On May 4, 2017, Jusino also signed a "Waiver of 48-Hour Hearing Notice and/or Attendance," indicating that he waived his attendance at his Special Needs Management hearing. *Id.* at 36; *see also* Doc. No. 151-2 at 5.

The report of the hearing indicates that reviewing officials authorized Special Needs Management placement for Jusino. *See* Doc. No. 131 at 28. The report states that the information relied upon was the "Memo from Warden Faneuff to Director Maiga dated April 25, 2017, Special Needs Custody Management Plan, and Individualized Facility Management Plan dated April 28, 2017." *Id.* Furthermore, the report outlines reasons for the placement, including whether Jusino was a threat to "staff, other inmates, himself, or the public"; that Special Needs Management was "appropriate" based on Jusino's "institutional history," including Jusino's history in administrative segregation and disciplinary reports; and the need to "address . . . Jusino's management needs on an individualized basis." *Id.* at 27-28. Tugie and the director of OCPM isigned the report. *Id.* Jusino was reclassified as Special Needs Management status on May 9, 2017. *Id.* at 25.

There is a genuine issue of material fact regarding the nature of the conditions of Jusino's confinement in Special Needs Management and to what extent those conditions are comparable to administrative segregation. *See, e.g.*, Doc. No. 141-1 at ¶ 19 (Jusino affidavit submitting that "Special Needs Status is managed in a[n] Administrative Segregation Status"); *id.* at ¶ 26 (Jusino affidavit stating that in 2018, Jusino "accumulated privileges" while on Special Needs Status that made his conditions "resemble general population."). Because I must construe the record in the

light most favorable to the nonmoving party, I read the record to suggest that the initial conditions of Special Needs Management Status were comparable to administrative segregation, but Jusino later gained privileges while on Special Needs Management Status that made Special Needs Management Status incomparable to administrative segregation by 2018. Therefore, in assessing the adequacy of procedures for Jusino's initial placement on Special Needs Management Status, I will apply the standards in *Hewitt* and *Proctor*. *Hewitt v. Helms*, 459 U.S. 460 (1983); *Proctor*, 846 F.3d 597.

In *Hewitt*, the Supreme Court held that when a prisoner is transferred to administrative segregation, he "must . . . receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." 459 U.S. at 476. The procedure can be "an informal, nonadversary evidentiary review," and "a written statement by the inmate" can satisfy the requirement of being heard. *Id*. In *Proctor*, the Second Circuit held that periodic reviews of the continued confinement of individuals on administrative segregation must be "meaningful" and must "at least satisfy the following criteria": (1) "the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified"; (2) "the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available"; and (3) "the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term." *Proctor*, 846 F.3d at 610-11.

Even if I were to assume that Jusino's conditions in Special Needs compared to administrative segregation, the process that Jusino received with respect to his initial classification as Special Needs Management Status was sufficient under *Hewitt* and *Proctor*. The

record demonstrates that prison officials reviewing Jusino's removal to Special Needs Management Status considered whether Jusino's placement on Special Needs Management Status was justified, they listed their rationales in their reports and correspondence among each other, and they expressly considered safety and security as reasons for his confinement on Special Needs Management Status. *See Proctor*, 846 F.3d at 610-11. Moreover, Jusino was afforded an opportunity to be present at the hearing, which he waived.[4] *See Hewitt*, 459 U.S. at 476.

I therefore conclude that no trier of fact could find that Jusino received constitutionally inadequate procedures with respect to his initial classification as Special Needs Management Status in 2017. Summary judgment on that issue is therefore granted.

### b. Jusino's Review Throughout his Special Needs Management Status

The defendants also contend that Jusino received adequate due process throughout his classification as a Special Needs inmate. *See* Doc. No. 128-2 at 23. Jusino submits that he "never" saw "any written plan, outlining the steps for [his] transition from the Special Needs Management classification to the Security Risk Group classification." Doc. No. 141-6 at ¶ 4. He further states that he was not provided "notice" regarding "any of the Special Needs status reviews" or an "opportunity to be heard" at those reviews. *See id.* at ¶ 13; Doc. No. 141-1 at ¶ 21. By contrast, Papoosha submits in his declaration that Jusino "was well informed that periodic reviews were conducted . . . and he had ample opportunity to present his views on his

---

[4] Jusino argues that he waived his right to participate in those hearings "because he recognized the futility of such efforts." Doc. No. 141 at 11; Doc. No. 128-14 at 10 (Jusino's request to contact the Special Needs hearing officer and waive his hearing because "everybody knows I'm going on S.N."). But Jusino's argument appears couched in the doctrine of exhaustion instead of constitutional due process. Even assuming *arguendo* the applicability of such an argument, Jusino has not shown futility. Jusino has only established that he believed he was unlikely to persuade the prison officials not to place him on Special Needs Management Status—he has not supplied sufficient facts from which a jury could determine that any effort to oppose Special Needs classification, including by attending the hearing, would have been futile.

[Security Risk Group] status. [Jusino] also had the opportunity to communicate with supervisory staff at his facility, or with the members of the SRG review committee." Doc. No. 156-1 at ¶ 5.

      i.  <u>Constitutional Entitlement to a Hearing</u>

In the non-prison context, the Supreme Court has held that "[t]he fundamental requirement of due process is the *opportunity to be heard* 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Supreme Court has not, however, expressly extended the right to an "opportunity to be heard" to every in-prison context in which process is due. In *Hewitt*, the Supreme Court stated that once an individual is confined in administrative segregation, "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." 59 U.S. at 477 n.9. *Hewitt*, however, provided that those periodic reviews of a prisoner's continued confinement in administrative segregation "will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* Therefore, although *Hewitt* appears to mandate "notice of the charges against [an inmate] and an opportunity to present his views" when that inmate is being *transferred* to administrative segregation, *Hewitt* does not appear to require those procedures when deciding whether to "*continue* confinement" in those conditions. 459 U.S. at 476, 477 n.9 (emphasis added).

Furthermore, the Second Circuit's decision in *Proctor*, applying both *Mathews* and *Hewitt*, held that periodic reviews of a prisoner's continued confinement in administrative segregation must be "meaningful." 846 F.3d at 614. However, the Second Circuit made no mention of whether those periodic reviews should also include an opportunity to be heard. *Id.* In fact, *Proctor* set forth three criteria that those meaningful periodic reviews must meet in order to

fulfill the constitutional minimum of due process, and none of those criteria included a hearing. 846 F.3d at 610-12.

Based on those precedential decisions, I conclude that although Jusino is entitled to meaningful periodic reviews throughout the duration of his administrative segregation, based on the current state of the law, his due process rights were not violated by his inability to be heard in connection with his six-month reviews.[5]

### ii. Adequacy of Special Needs Classification Reviews Under *Proctor*'s Three Criteria

Meaningful periodic reviews under *Proctor* must "at least satisfy" three criteria: (1) "the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified"; (2) "the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available"; and (3) "the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term." *Proctor*, 846 F.3d at 610.

Prison officials placed Jusino on Special Needs Status on May 9, 2017 and removed him from that status on July 11, 2018. *See* Doc. No. 131 at 46; *see* Doc. No. 151-2 at 2. The record reflects that prison officials regularly reviewed Jusino's classification while he was on Special Needs Management Status. After the officials conducted their reviews, they filled out classification review sheets dated May 22, 2017; June 27, 2017; November 28, 2017; December

---

[5] Jusino appears to base his due process claim at least in part on the defendants' alleged failure to comply with the DOC's administrative directives, which mandate a six-month classification hearing for inmates on Special Needs. *See* Doc. No. 157 at 5. However, the Supreme Court in 1995 discouraged courts from basing constitutional due process claims on state regulations. *Sandin*, 515 U.S. at 480-83. Furthermore, other courts within this circuit have held that a state's "failure to follow its own regulations does not itself rise to the level of a constitutional violation." *Perry v. Maloney*, 2021 WL 6127070, at *3 (S.D.N.Y. Dec. 27, 2021); *see also Taylor v. Santana*, 2007 WL 737485, at *6 (S.D.N.Y. Mar. 6, 2007), *aff'd sub nom*. *Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80 (2d Cir. 2009).

28, 2017; February 27, 2018; and April 24, 2018. *See* Doc. No. 130 at 2-9. The classification

review sheets reflect that the reviews considered Jusino's risk scores and need scores. *Id*. Risk

scores were divided into seven categories—risk of escape, length of confinement, discipline,

severe/violent offense, detainers, security risk group, and violence history. *Id*. Officials rated

Jusino on a 1-through-5 scale for each category. An additional category, "overall," mirrored the

highest score Jusino received on any of the other seven categories. *Id.* In addition, the

classification review sheets' need scores included six categories—medical, mental health,

alcohol/drug, vocational, community, and education. *Id*.

    The scoring categories that prison officials considered when reviewing Jusino showcase a

reasonable prioritization of safety and security, in conformity with *Proctor*'s third criterion. In

particular, prison officials explicitly considered Jusino's likelihood of escape, disciplinary issues,

and history of violence when determining his continued classification on Special Needs

Management Status. Those classification reviews therefore meet *Proctor*'s third criterion.

Beyond that, however, the reviews are largely devoid of commentary or elaboration. *See*

*generally* Doc. No. 130 at 2-9.

    Rodriguez states in his declaration that DOC staff "including the warden, deputy warden,

chief psychologist, correctional captain(s), and counselor supervisor" participated in the

classification review meetings regarding Jusino's continued placement on Special Needs Status.

Doc. No. 128-13 at ¶¶ 9-10. During those meetings, officials would discuss Jusino's "progress,

including but not limited to [his] disciplinary history, his participation in DOC programs and

offerings, and all of the matters detailed in the SN management plan." *Id*. The Special Needs

Status Individualized Facility Management Plan ("SN management plan") in the record includes,

*inter alia*, an assessment of Jusino's mental health, medical score, and Security Risk Group; a list

of his disciplinary reports to date, the reason for Jusino's Special Needs placement, and the goals for his placement. *See* Doc. No. 131 at 32-33. Because the record reflects that DOC staff met to discuss Jusino's continued placement on Special Needs Status, I conclude that the defendants also fulfilled *Proctor*'s first criterion, that "the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified." *Proctor*, 846 F.3d at 610.

I cannot determine from the record, however, whether the defendants fulfilled *Proctor*'s second criterion, the requirement that "the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available." *Id.* Even if the officials discussed the SN management plan as Rodriguez contends, the copy of the SN management plan included in the record is dated April 28, 2017. Doc. No. 128-13 at ¶ 10; Doc. No. 131 at 32. The record also shows that the SN management plan does not serve as "a plan for release from Special Needs." Doc. No. 73-13 at 7 (letter from Kocienda). It is not clear from the record whether the assessments initially conducted when the SN management plan was first prepared were the same assessments conducted by those who reviewed Jusino's continued placement on Special Needs Status. The record further suggests that ordinarily a "population management hearing" is held before a plan can be derived to release an inmate from Special Needs, yet the record does not show that such a hearing was held. *Id.* Moreover, the record shows that Jusino complained that some of the SN management plan's "goals for completion of [Special Needs] placement" were at times infeasible because the programs were not available to Jusino. *See* doc. No. 73-13 at 6 (Jusino inmate request form stating that the "START NOW" and "Anger Management" programs recommended by the plan were "not being provided due to the lack of staff").

Accordingly, reading the record in the light most favorable to Jusino, it would not appear that the defendants fulfilled the *Proctor*'s second criteria. Thus, outstanding questions of fact preclude me from determining whether the Jusino's classification reviews throughout his Special Needs term were procedurally adequate under *Proctor*. Summary judgment on Jusino's due process claim regarding his reviews throughout his Special Needs term is therefore denied.

      c.   Jusino's Transition to Security Risk Group

The defendants also aver that Jusino received all the process he was due regarding his transition from Special Needs to the Security Risk Group. Doc. No. 128-2 at 24. They concede that "a review was conducted . . . but no hearing was held." *Id*. They maintain that it is "longstanding policy and practice" of the DOC not to provide a hearing to an inmate "removed from the higher management status" and placed on the Security Risk Group phase program. *Id*. at 24-25. Additionally, whether Jusino "expressed a willingness" to participate in the Security Risk Group phase program is a disputed fact. *See id*. at 25. Jusino states he "never expressed a willingness to participate in Security Risk Group Programming" and that he "requested removal from Security Risk Group status." Doc. No. 141-6 at ¶ 5.

The records reflect that a review was conducted prior to removing Jusino from Special Needs Management Status and placing him in the Security Risk Group program. In particular, one prison official reviewed Jusino's Initial Restrictive Status Report regarding his placement in Special Needs Management Status and wrote a recommendation to remove Jusino from Special Needs "based on [his] positive interactions with staff and members of the inmate population," as well as his "willingness to participate in programs." Doc. No. 132 at 3. Another prison official signed that form to approve Jusino's release into the Security Risk Group Program. *Id*. Subsequently, Tugie, Maiga, and Rinaldi were included in emails sharing "the documentation

regarding the request to remove" Jusino from Special Needs to the Security Risk Group, and those emails suggest that Maiga and Rinaldi signed off on the removal. *Id.* at 8.

There is a genuine issue of fact regarding whether Jusino's conditions became more restrictive when he was transitioned out of Special Needs and into the Security Risk Group Program. Documentation provided by the defendants suggests that prison officials viewed Jusino's removal from Special Needs status as a reward for his progress. Other facts on the record provide a different account, however. The defendants' log[6] of Jusino's classification statuses shows that Jusino was on Security Risk Group Phase 4 before and during his placement on Special Needs Status in 2018. Doc. No. 151-2 at 2. When Jusino was removed from Special Needs Placement, he regressed to Security Risk Group Phase 3. *Id.* Earlier Security Risk Group phases correspond with fewer privileges and more restrictions. The log further shows that in April 2019, Jusino regressed further to Security Risk Group Phase 1. *Id.* at 5.

The defendants' log of classification statuses largely corresponds with Jusino's account of events. Jusino submits that he was removed from Special Needs and placed on "a more restrictive status," and when he was placed on that status in 2018, he lost the privileges he had accumulated while on Special Needs Status. Doc. No. 141-1 at ¶¶ 26, 28, 32. While on Special

---

[6] There are contradictions in the defendants' submission. The chart showing Jusino's statuses does not always correspond with the more detailed log. *Compare* Doc. No. 151-2 at 2 *and id.* at 3-5. For example, the chart shows that Jusino was on Special Monitoring status from 2018 through 2020 and during 2021, but the log only states that he was on Special Monitoring status from November 2020 through May 2021. *Id.* Where there are contradictions, I read the defendants' submission in the light most favorable to Jusino.

The contradictions in the defendants' chart showing Jusino's statuses is not the only error in the defendants' submissions. The defendants also claim in their briefing that, with respect to Jusino's conditions of confinement claims at MacDougall-Walker, he only filed grievances regarding the hot and cold water in his cell, the absence of a lock on the unit mailbox, the lack of programming, the lack of availability of cleaning products for his cell, and the lack of availability of legal envelopes. *See* Doc. No. 128-2 at 12; Doc. No. 144-4 at ¶ 7. Contrary to the contentions in the defendants' briefs, the record shows that Jusino also filed grievances for the following conditions of confinement claims while at MacDougall-Walker: isolation or solitary confinement, recreation, exercise, job assignment, non-immediate family visits, commissary, and access to property. *See* Doc. No. 144-5 at 23 (grievance # 137-19-062); *id.* at 21; *id.* at 28 (grievance # 137-19-066); *id.* at 26.

Accordingly, in light of the presence of multiple contradictions in the defendants' submissions, the parties are reminded of their obligations of candor to the Court.

Needs Management Status in 2018, Jusino states that he was permitted to be unrestrained when exiting his cell, as well as allowed television privileges, to keep all his property in his cell, daily showers, two hours of recreation, "gym recreation, job assignment, group programming (anger management)," a $75 limit for commissary spending and a $150 holiday limit, visits from non-immediate family, and an "extended hour" visit from his out-of-state mother. *Id*. at ¶ 26. On the other hand, Jusino states that after he was transferred out of Special Needs, he was restricted to isolation including one hour of recreation, no gym recreation, no congregation program, "no job assignment[s], immediate family visit only" with no permission for his mother to visit from out-of-state, a commissary spending limit of $35.00, "restriction of [his] personal property," and a $150 limit on holiday commissary spending. *Id*. at ¶ 33.

The defendants, in contrast, seem to contend that Jusino's conditions only became restricted after an April 2019 disciplinary incident to which they submit he pled guilty. *See* Doc. No. 128-15 at ¶¶ 8-9, 11. As a result of that incident, Jusino regressed in the Security Risk Group Phase Program. *Id*. at ¶ 11. Jusino does not dispute the fact that his conditions became more restrictive after April 2019. In fact, Jusino submits that after the April 2019 disciplinary report, he faced additional restrictions including lengthy restrictions of his television privileges; one hour of outdoor recreation for five days a week; "restraint to [his] back inside a secured cage; restraint coming out of [his] cell"; three fifteen-minute showers per week; "restriction[s] on property, commissary, [and] privileges; $25.00 commissary limit; no holiday commissary, [and] no programs." Doc. No. 141-1 at ¶ 33 (cleaned up). Jusino's account, however, presents those restrictions as additional conditions that exacerbated the already-restrictive conditions he faced since his transition from Special Needs to the Security Risk Group. *Id*. at ¶¶ 32-33.

The point at which Jusino transitioned from confinement conditions "that resemble general population" to restrictive confinement conditions is a material issue. *See* Doc. No. 141-1 at ¶ 26; *see also* Doc. No. 73-13 at 10-11 (describing some conditions at various Security Risk Group phases, but not providing information regarding, for example, time in cell and recreation for inmates at phases 3 and 4). Under *Hewitt*, when a prisoner is transferred to administrative segregation, he "must . . . receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." 459 U.S. at 476. The procedure can be "an informal, nonadversary evidentiary review," and "a written statement by the inmate" can satisfy the requirement of being heard. *Id*. Although prisoners are also entitled to review regarding their *continued* confinement in administrative segregation, procedural protections are especially strong at the junction at which a prisoner is first transferred to administrative segregation. *See Proctor*, 846 F.3d at 614 (requiring meaningful periodic reviews of a prisoner's continued confinement in administrative segregation but making no mention of whether those reviews should include an opportunity to be heard); *see also Hewitt*, 459 U.S. at 477 n.9. If Jusino was indeed transferred in 2018 from conditions resembling general population in Special Needs Management Status to restrictive conditions resembling administrative segregation in the Security Risk Group, then the procedural protections of *Hewitt* attach to that transfer. Therefore, Jusino would have been entitled to notice and an "opportunity to present his views" before the transition. *Hewitt*, 459 U.S. at 476. The defendants do not contest that Jusino received neither. Whether the review process employed by the defendants is "longstanding policy" for the DOC has no bearing on the constitutionality of that process. *See* Doc. No. 128-2 at 24; *see also supra* note 5.

Because there is a genuine issue of material fact regarding to what extent Jusino's transfer from Special Needs to the Security Risk Group Phase 3 involved the imposition of restrictive conditions, the defendants' motion for summary judgment on the ground that Jusino "received all the process he was due in regard to his SRG classification" is denied. *See* Doc. No. 128-2 at 24.

### 3.   *Statute of Limitations for Due Process Claims*

The defendants also contend that any of Jusino's claims based on alleged violations prior to December 7, 2015 are barred by the statute of limitations. Doc. No. 128-2 at 3. Jusino's due process claims appear to include two events that took place prior to December 7, 2015—Jusino's 2010 placement on Special Needs Status, and Jusino's placement in the Security Risk Group.

Because "Congress did not enact a statute of limitations" for Section 1983 actions, federal courts "borrow a state statute of limitations" for those claims. *Lounsbury*, 25 F.3d at 133. The statute of limitations for a Section 1983 action in Connecticut is "three years from the date of the act or omission complained of." *Walker*, 430 F.3d at 562 (quoting Conn. Gen. Stat. § 52-577). Although the statute of limitations for Section 1983 suits are based on state law, "federal law governs the date of accrual." *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995). That date is based on "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Singleton v. City of New York*, 632 F.2d 191 (2d Cir. 1980)). An "injury" in that context is "a wrong for which damages may be recovered in a civil action." *Singleton*, 632 F.2d at 192. An injury can accrue even if "the full extent of the injury is not then known or predictable." *Richard v. Leclaire*, 2017 WL 9511181, at *9 (N.D.N.Y. July 10, 2017) (quoting *Fahs Const. Group, Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (per curiam)), *report and recommendation adopted*, 2017 WL 4349381 (N.D.N.Y. Sept. 29, 2017).

The defendants argue that because Jusino "basically complains about his restrictive housing status . . . since 2007," he "knew or had reason to know of the injury." Doc. No. 128-2 at 4 (quoting *Pinaud*, 52 F.3d at 1156). In support, the defendants cite to portions of Jusino's complaint in which Jusino alleges facts regarding his classification in restrictive housing status, as a security risk group member, and in special needs management. *Id.* (citing Doc. No. 121 at ¶¶ 26, 30, 36)). For each designation, the defendants argue, Jusino "has been advised of and participated in the various processes" and "knew the consequences of the designations." Doc. No. 144 at 2. The defendants posit that Jusino had three years from the dates of each of those injuries (*i.e.*, his classifications) to bring his Section 1983 claims. Doc. No. 128-2 at 4.

Jusino argues that the continuing violation doctrine should be applied to toll the statute of limitation for his claims. The continuing violation doctrine is "an exception . . . to 'the normal knew-or-should-have-known accrual date' in cases of a continuing violation." *JCG v. Ercole*, 2014 WL 1630815, at *9 (S.D.N.Y. Apr. 24, 2014) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)), *report and recommendation adopted*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014). "Although the doctrine is utilized most often in connection with certain Title VII claims," the Second Circuit "has applied the doctrine to various constitutional claims brought under § 1983." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020). The Second Circuit has held that "[t]o trigger the continuing violation doctrine" for a Section 1983 claim, "a plaintiff 'must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy.'" *Id.* (quoting *Fahs Const. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013)). Thus, if the record supports "an unconstitutional act committed by each particular defendant that falls within the three-year statutory period," then

acts by the defendant that would otherwise be time-barred may be considered as part of a continuing course of conduct. *Id*. at 310.

    a.   2010 Special Needs Classification

Jusino argues that his claims regarding his 2010 Special Needs classification are not time barred because he was not aware of his injuries resulting from that classification until he became aware of the "inappropriate" and "true" reasons for the classification and associated confinement conditions. Doc. No. 141 at 2.

To the extent that Jusino brings a due process claim based on inadequate procedures in connection with his 2010 Special Needs classification, that claim is time barred. A "cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (quoting 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526-27 (1991)). Special Needs classification is a classification that results in a prisoner being placed in administrative segregation. *See* Doc. No. 141-1 at ¶ 19. Jusino therefore should have been aware of his classification as Special Needs Management Status when his confinement conditions changed as a result of that classification. It follows that Jusino should have become aware of his due process injury at the point at which he became aware of his Special Needs classification. *Id.* at ¶ 21. Even if Jusino later learned of additional "inappropriate" reasons for his 2010 classification, those details merely serve to show Jusino the "full extent" of his injury and do not toll the statute of limitations. *See Wallace*, 549 U.S. at 391.

Furthermore, the continuing violation doctrine does not apply to Jusino's due process claim based on his 2010 Special Needs classification. The Second Circuit has held that, for purposes of a due process claim, "a discrete claim may accrue . . . each time that a defendant fails to provide an inmate with the notice, hearing, or evaluation to which he is entitled after a

liberty interest attaches." *Gonzalez v. Hasty*, 802 F.3d 212, 223 (2d Cir. 2015). "These denials or failures are discrete acts," and the continuing violation doctrine does not apply "to claims of this nature." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). To the extent that Jusino was denied adequate process during his Special Needs classification in 2010, that denial was a discrete act, and the continuing violation doctrine therefore does not apply.

b.  Security Risk Group Placement

The continuing violation doctrine may apply to toll Jusino's claims related to his Security Risk Group placement. As the defendants concede, Jusino has been on Security Risk Group status since 2009, and his brief periods on Special Needs Management Status "did not change or alter his SRG classification as he remained designated as a SRG member." Doc. No. 128-2 at 22; *see also* Doc. No. 151-2 at 2. Jusino's Security Risk Group placement can therefore be characterized as an ongoing policy or continuing course of conduct. *See Lucente*, 980 F.3d at 309.

For the continuing violation doctrine to apply to toll claims against a particular defendant, Jusino will also need to show "some non-time-barred acts [by that defendant] taken in furtherance" of the violation. *Id.* (quoting *Fahs Const. Grp.*, 725 F.3d at 292). Whether each defendant acted in furtherance of an unconstitutional policy related to Jusino's Security Risk Group status is a factual issue I cannot determine at the summary judgment stage. Jusino's claims regarding Security Risk Group status that are beyond the statutory period may therefore proceed to trial.

D.  Qualified Immunity

The defendants also argue that they are entitled to qualified immunity on all claims. Specifically, the defendants argue that it was not clearly established that Jusino was entitled to a

hearing prior to his Security Risk Group Classification in 2018. Doc. No. 144 at 20; Doc. No. 128-2 at 28. Additionally, the defendants argue that they were objectively reasonable because they followed DOC directives and policies. Doc. No. 128-2 at 29; Doc. No. 144 at 20.

Qualified immunity is "an affirmative defense on which the defendant officials bear the burden of proof." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). "Qualified immunity protects officials from damages liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or if it was objectively reasonable for the officer to believe that his actions were lawful at the time of the challenged act." *Dorceant v. Aquino*, 2018 WL 3869891, at *2 (E.D.N.Y. Aug. 15, 2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016)) (cleaned up); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The availability of qualified immunity does not turn on whether the defendants violated the plaintiff's rights; qualified immunity is a defense." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995).

1. *Whether Due Process Claim Based on 2018 Security Risk Group Designation Was Clearly Established*

The defendants argue that "[t]here is no clearly established law" making clear Jusino's entitlement to a hearing before his Security Risk Group transition in 2018. Doc. No. 144 at 20. Since 2000, it has been clearly established in the Second Circuit that confinement for 305 days in segregation triggers due process protections. *Colon*, 215 F.3d at 230-32; *see also Palmer v. Richard*s, 364 F.3d 60, 64-65 (2d Cir. 2004). Furthermore, as early as 1983, the Supreme Court clearly established that before being transferred to administrative segregation, "[a]n inmate must . . . receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation."

44

*Hewitt*, 459 U.S. at 476. The procedure can be "an informal, nonadversary evidentiary review," and "a written statement by the inmate" can satisfy the requirement of being heard. *Id*.

As previously outlined, there is a genuine issue of fact regarding the nature of Jusino's conditions of confinement when he was transitioned out of Special Needs and into the Security Risk Group Program Phase 3. If Jusino indeed transitioned in 2018 from conditions resembling general population in Special Needs Management Status to restrictive conditions resembling administrative segregation in the Security Risk Group, then he would have been entitled to notice and an "opportunity to present his views" before that transition. *Hewitt*, 459 U.S. at 476. Accordingly, genuine issues of material fact regarding Jusino's confinement conditions preclude me from determining whether Jusino possessed the clearly established right to an opportunity to be heard before his 2018 Security Risk Group Transition. The defendants' request for qualified immunity on that issue is therefore denied.

2.   *Whether the Defendants Were Objectively Reasonable When Following DOC Policies*

The defendants also contend that they are entitled to qualified immunity because "at all times" relevant to Jusino's claims, "the defendants followed their own directives and policies regarding the plaintiff's classification." Doc. No. 144 at 20; *see also* Doc. No. 156 at 22. Therefore, the defendants aver, "it was objectively reasonable" for them "to believe they were not violating any of [Jusino's] clearly established rights." Doc. No. 144 at 20. Even though the defendants bear the burden of establishing qualified immunity, their briefing on qualified immunity does not explicitly point to which directives or policies they followed. *See* Doc. No. 128-2 at 26-29; Doc. No. 144 at 17-20; Doc. No. 156 at 22. Because the defendants have repeatedly asserted that Jusino's lack of hearing during his 2018 transition to Security Risk

Group confinement was pursuant to longstanding DOC policy, I will address only that argument. *See, e.g.*, Doc. No. 128-2 at 24.

Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Still, the determination turns on "objective factors"—what "a reasonably competent public official should know" regarding "the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982); *see also Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000).

As a general matter, the defendants are incorrect in suggesting that public officials are entitled to qualified immunity solely because they "follow[ed] their own directives and policies." Doc. No. 144 at 20. Courts in this circuit have at times denied qualified immunity in cases in which officials had enforced or followed unconstitutional policies. *See, e.g.*, *Walsh v. Franco*, 849 F.2d 66, 69 (2d Cir. 1988); *Sorensen v. City of New York*, 42 F. App'x 507, 511 (2d Cir. 2002); *see also Augustin v. Jablonsky*, 2001 WL 770839, at *10 (E.D.N.Y. Mar. 8, 2001). On its own, "following" a policy is not sufficient to establish objective reasonableness for qualified immunity.

Additional facts in the case at bar, however, support the conclusion that officers lacking any authority to modify DOC policies were objectively reasonable in withholding a hearing from Jusino when transferring him to Security Risk Group Phase 3 in 2018. Special Needs Management Status and Security Risk Group Status are both Restrictive Housing Statuses, so it is objectively reasonable for a prison official to believe that the transition from one to another would not trigger *Hewitt*'s right to a hearing. *Hewitt* clearly establishes Jusino's right to be heard when he is transferred from conditions resembling general population to restrictive conditions resembling administrative segregation. 459 U.S. at 476. Nevertheless, it is objectively reasonable

for a lower-level DOC official not to know that Jusino's circumstances were sufficiently analogous to the facts in *Hewitt* such that Jusino was entitled to additional procedures absent from the DOC directives. *See Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) ("[E]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful."). That does not necessarily mean that those prison officials may not have violated Jusino's constitutional rights, nor that the violation was not serious—it only means that the interest in "avoid[ing] excessive disruption of government" and resolving issues on summary judgment weighs against holding those specific defendants liable for the alleged violation. *Harlow*, 457 U.S. at 818.

In summary, regarding Jusino's 2018 transition from Special Needs to Security Risk Group Phase 3, to the extent that DOC officials with no authority to modify DOC policies denied Jusino a hearing in compliance with DOC directives or policies, the conduct of those defendants is objectively reasonable. A review of the positions that the defendants held during the relevant timeframe reveals that certain defendants lacked that authority. Rollin Cook, for example, began his term as commissioner in January 2019. Doc. No. 151-1 at 2. Mark Frayne served only as a "Supervising Psych Clinician." *Id*. Thomas Kocienda served only as a Health Management Administrator. *Id*. The defendants have presented evidence showing that Papoosha, who Jusino contends was personally involved in Jusino's 2018 transition, only assumed his Security Risk Coordinator position in 2019. *See* Doc. No. 151-1 at 2; Doc. No. 128-15 at ¶ 1; Doc. No. 128-14 at ¶ 2. Because those four defendants could not have had the authority to affect Jusino's access to a hearing when he was transitioned to Security Risk Group Phase 3, I grant those four defendants

qualified immunity for Jusino's due process claim regarding the 2018 transition from Special Needs to Security Risk Group Phase 3.

Regarding the other twelve defendants, there are outstanding questions of fact concerning their personal involvement in the due process claim regarding the 2018 transition. I therefore cannot determine as a matter of law which of the twelve remaining defendants may be entitled to qualified immunity for that claim. *See Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) ("If there are unresolved factual issues which prevent an early disposition of the defense of [qualified immunity], the jury should decide these issues on special interrogatories. The ultimate legal determination whether, on the facts found, a reasonable [official] should have known he acted unlawfully is a question of law better left for the court to decide.").

Accordingly, the defendant's motion for summary judgment based on qualified immunity is granted in part and denied in part.

## IV.    Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, doc. no. 128, is **granted in part and denied in part**. Jusino's remaining claims may proceed to trial.

Within fourteen days of this Order, the parties shall file a joint status report indicating whether they request a referral to a United States Magistrate Judge for settlement purposes.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of January 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
